50,910 (La.App. 2 Cir. 9/28/16)

**Audrey NUGENT, Respondent**

v.

**CAR TOWN OF MONROE, INC., Applicant**

**No. 50,910-CW**

Court of Appeal of Louisiana, Second Circuit.

September 28, 2016.

NEAL LAW FIRM By: Mark J. Neal Jordan Haedicke Counsel for Applicant

STREET & STREET By: C. Daniel Street Counsel for Respondent

Before WILLIAMS, DREW and MOORE, JJ.

MOORE, J.

The defendants, Car Town of Monroe Inc. and West Monroe Land Development Co., seek supervisory review of a ruling that granted a new trial in favor of the plaintiff, Audrey Nugent, after a 12-member jury rejected Ms. Nugent's claim for personal injury. For the reasons expressed, we now grant the writ and make it peremptory, vacate the order of new trial and reinstate the jury's verdict.

## Factual Background

Car Town is a used car business at 11 Louisville Avenue, essentially at the foot of the Lea Joyner (U.S. Hwy. 80) bridge, in Monroe. The building was originally designed as a service station and built over 50 years ago. The front door is on a slab that sits 7½ inches above the pavement. The service station closed and, in 1987, Car Town moved its used car lot to the location, using the building as its office; in 1989, West Monroe Land bought the lot. Steve Taylor, a co-owner of Car Town and a partner in West Monroe Land, testified that he sells about 40 cars a month and that somewhere between 140 and 175 people a week actually walk through the front door and into the office. Since his first involvement with Car Town, in 1987, nobody had ever stumbled or fallen over the 7½" step at the front door.

On the morning of November 1, 2010, Ms. Nugent came to Car Town to make a warranty claim. Her adult son had bought a car there and, on that morning, it would not start; she had to drive him to work and then she stopped at Car Town, about 7:00 am. It was still dark, but she saw lights on in the office, so she went in. She admitted she saw the 71/2" threshold and stepped over it. Two men were in the office. She asked the car salesman, Charles Wisenor, about the warranty on her son's car; Wisenor told her she had to go to Ink's Firestone (about 16 blocks down Louisville Ave.) for service on the warranty.

Ms. Nugent turned to leave and placed her hand on the lever arm to push the door open. The other man, a friend of Wisenor's who used to hang around and drink coffee there, suddenly spoke up, asking her what she had done for Halloween. She hesitated for an instant, listening to his question, and then pushed the lever and stepped out the door, forgetting that the first step was 7½" down. She strode

into empty space, stumbled, and avoided hitting the pavement only by clinging to the lever arm.

Ms. Nugent filed this personal injury suit in November 2011, alleging that the incident injured her neck and middle back and aggravated a preexisting condition in her lower back. She alleged premises liability in that the 7½" drop-off was an unreasonably dangerous condition, which the defendants failed to mark, remedy or warn about. She alleged special damages of over $65,000.

### Trial Evidence and Verdict

The matter came to trial in May 2014. Ms. Nugent testified as outlined above, admitting that she had entered the door without any problem but was momentarily distracted when the old guy spoke to her, and must have forgotten about the steep drop. In addition to extensive testimony about her medical history, she admitted filing suit against a Bonanza Restaurant over a slip-and-fall some 20 years earlier, receiving a settlement, and filing suits against a nursing home and a Chevrolet dealership. She also admitted that as a result of the "service" provided for her son's car, she had demonstrated in front of Car Town, recruiting as pickets immigrants who had never bought a car in the United States.

Ms. Nugent's expert, Dennis Howard, of Baton Rouge, was a certified safety professional and accepted as an expert in accident prevention. He testified that a step this high is a dangerous condition, as it causes people to "overstep" and "typically we will stumble when we encounter a change in elevation like this." He further testified that current building and safety codes require an "even area" on both sides of any door; under the ADA no more than a half-inch rise is allowed anywhere. He conceded that when this building was first built, it complied with codes, but said it was now noncompliant. He suggested that the owner should simply not use the door, but failing that, he could build a platform and gradient leading to the door, install handrails or footlights, put down a warning stripe, post a sign (at a cost of only $10-20) or, at the very least, give an oral warning.

On cross-examination, Mr. Howard conceded that he formed his opinions strictly using four photos, before he actually visited the site; that the doorstep complied with all codes when it was built; and that a pedestrian should be on the lookout for dangerous conditions. He also admitted that an ADA-compliant ramp outside this door would have to be at least 7 feet long and would lead pedestrians directly into the path of vehicular traffic.

Steve Taylor testified that the threshold had existed ever since he first got involved with the company, in 1987, and in that time nobody had ever stumbled or fallen trying to get through the door. He admitted that about 23 feet from the front door was a side door for which they added a wheelchair ramp in 2000; however, very few handicapped customers patronized Car Town, because they usually could not drive. Also, when he renovated the side door, neither his engineer, the Fire Marshal nor any of his insurance agents told him he also needed to redo the front door.

Car Town's salesman, Wisenor, largely corroborated Ms. Nugent's account of how the accident occurred. He testified that the other guy in the office that morning was now deceased. He confirmed that in his 14 years at Car Town, he had never seen anybody stumble on the front doorstep.

Car Town's expert, Fred Vanderbrook Jr., of Covington, was a mechanical engineer and accepted as an expert in forensic engineering and accident analysis. He testified that the 7½" step was code-compliant when the structure was built and still com-

pliant, as structures are not required to upgrade every time codes change. He also testified that the history of accidents was very relevant to the question of safety, and that in his view this doorstep was not unreasonably dangerous. As a proffer—outside the presence of the jury—Mr. Vanderbrook testified that he had also inspected the Fourth Judicial District Courthouse and found that many steps leading into the building, and inside the courtroom itself, did not comply with current codes.

After deliberating under two hours, the jury returned a verdict form, answering the first interrogatory, "Do you find that plaintiff, Audrey Nugent, proved by a preponderance of the evidence that the 71/2 inch drop-off at the door of Car Town constituted an unreasonably dangerous condition at the time she was injured?"—NO. The jury was polled; the vote was 9-3.

### Grant of New Trial

Ms. Nugent filed a motion for JNOV or new trial, urging chiefly that both experts "agreed" that codes and standards affecting this business have changed to eliminate the 7½" drop-off at doorways. The defendants opposed the motion, countering that both experts agreed the doorstep was code-compliant when built and did not have to be modified.

The district court held a hearing in May 2015 and issued an eight-page ruling granting a new trial. After citing the standards for premises liability, JNOV and new trial, the court first found that because the drop-off had existed since the defendants acquired the building, they had *actual notice* of the condition of the door, as required by La. C.C. arts. 2317.1 and 2322, and that the condition is "plain and obvious to all." However, the court found

the defendants had a duty to "warn or post signs" because the drop-off "posed a risk of harm," and they failed to do so. Finally, the court "disagreed" with the defendants' position that the absence of prior incidents absolved them: "numerous appellate decisions" have found an unreasonable risk of harm when the plaintiff's injury was the first reported in a certain place.[1] The court therefore granted Ms. Nugent a new trial.

The defendants applied for supervisory review, which this court granted on April 18, 2016, and set for oral argument.

### The Parties' Positions

The defendants designate one assignment of error: the court committed legal error in determining Ms. Nugent was entitled to a new trial on the ground that the verdict is clearly contrary to the law and evidence. They cite the standard for new trial, "the verdict or judgment appears clearly contrary to the law and evidence," La. C. C. P. art. 1972 (1), and the caselaw that a verdict should not be set aside "if it is supportable by any fair interpretation of the evidence," *Davis v. Wal–Mart Stores Inc.*, 2000–0445 (La. 11/28/00), 774 So.2d 84. They argue that under the cases interpreting Art. 2317.1, the owner is liable only if the condition is "unreasonably dangerous," e.g., *Burns v. CLK Investments V*, 2010–0277 (La.App. 4 Cir. 9/1/10), 45 So.3d 1152, *writ denied*, 2010–2283 (La. 1/7/11), 52 So.3d 886, while the district court explicitly found only a "risk of harm." They strongly dispute Ms. Nugent's assertion that Mr. Vanderbrook "agreed" the front entrance posed an unreasonable risk of harm, and reject this as a complete misstatement of his testimony. They reiterate that in over 20 years no

1. *Lawrence v. City of Shreveport*, 41,825 (La. App. 2 Cir. 1/31/07), 948 So.2d 1179, *writ denied*, 2007–0441 (La. 4/20/07), 954 So.2d 166; *Buchignani v. Lafayette Ins. Co.*, 41,384 (La.App. 2 Cir. 8/23/06), 938 So.2d 1198; *Burdis v. Lafourche Parish Police Jury*, 618 So.2d 971 (La.App. 1 Cir.), *writ denied*, 620 So.2d 843 (1993).

accidents had ever been reported at the entrance; that buildings not in compliance with new codes are not required to modify unless there is a "major renovation," *Luminais v. O.R.S.T. Inc.*, 06–749 (La.App. 5 Cir. 1/30/07), 951 So.2d 1200; and that there was no trial evidence that any kind of warning sign was required or would have prevented this accident. They urge this court to reinstate the jury's verdict.

Ms. Nugent responds that the district court did not abuse its discretion. She shows that two other drop-offs had been renovated and made safe, proving the defendants' knowledge of the condition. She argues that because La. C.C. art. 2322 refers to a building's "original condition," liability may attach even if the building was code-compliant when built. She contends that the alleged utility of the drop-off—to accommodate snow or floodwater—is minuscule compared to the huge risk it creates, and that the cost of remediation—$200 for a "landing," under $20 for warning signs—is negligible. She cites jurisprudence holding owners liable for drop-offs of 6"-8",[2] and one recent case that affirmed a trial court's finding that a 1½"-3" "misalignment" between the floor of an elevator and the lobby in a state office building was unreasonably dangerous, *Broussard v. State*, 2012–1238 (La. 4/5/13), 113 So.3d 175. Ms. Nugent submits that Car Town's 7½" drop-off was an obvious, unreasonably dangerous condition that could have been easily remedied, and asks this court to let the new trial proceed.

*Applicable Law*

■ A new trial shall be granted, upon contradictory motion of any party, "when the verdict or judgment appears clearly contrary to the law and the evidence." La. C. C. P. art. 1972 (1). Although the grant of a new trial under this provision is mandatory, the jurisprudence interpreting it recognizes the trial judge's discretion in determining whether the judgment is indeed contrary to the law and evidence. The decision to grant or deny a new trial "requires a discretionary balancing of many factors." *Davis v. Wal–Mart Stores, supra; Gibson v. Bossier City Gen'l Hosp.*, 594 So.2d 1332 (La.App. 2 Cir. 1991). Nevertheless, the discretion of the trial court is not unlimited. The trial court cannot freely interfere with any verdict with which it simply disagrees. *Davis v. Wal–Mart Stores, supra*. In *Guillory v. Lee*, 2009–0075 (La. 6/26/09), 16 So.3d 1104, the court explained:

The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is in the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus, the jury's verdict should not be set aside if it is

---

**2.** *Morgan v. Hartford Acc. & Indem. Co.*, 402 So.2d 640 (La.1981) (8" drop-off between interior rooms in a church); *Johnson v. Acadiana Med. Ctr.*, 524 So.2d 811 (La.App. 3 Cir. 1988) (6" drop-off at entrance/exit of medical center); *Miller v. Broussard*, 430 So.2d 330 (La.App. 3 Cir.), *writ denied*, 434 So.2d 1093 (1983) (7" drop-off out of restroom in a restaurant unreasonably dangerous but remedied

by a warning sign); *Head v. St. Paul Fire & Marine Ins. Co.*, 408 So.2d 1174 (La.App. 3 Cir.), *writ denied*, 412 So.2d 99 (1982) (hospital entrance with 6° slope that suddenly ran into a 22° curb); *Solito v. Horseshoe Entm't*, 36,667 (La.App. 2 Cir. 12/18/02), 834 So.2d 610 (6" drop-off at temporary entrance to casino hotel).

supportable by any fair interpretation of the evidence.

█ The standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. *Id.*; *Gibson v. Bossier City Gen'l Hosp.*, *supra*.

The liability of an owner for damages resulting from a defective building is regulated by these Civil Code articles:

## Art. 2317.1. Damages caused by ruin, vice, or defect in things

The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

## Art. 2322. Damage caused by ruin of building

The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

█ For liability to attach, the ruinous building or its defective component part must create an unreasonable risk of harm. *Broussard v. State*, *supra*; *Entrevia v. Hood*, 427 So.2d 1146 (La.1983). Although the precise phrase "unreasonable risk of harm" does not appear in the statutes governing premises liability, our courts have consistently applied this test, with the result that the doctrine has attained the status of *jurisprudence constante*. *Broussard v. State*, *supra* at fn. 8, and citations therein. Whether a condition poses an unreasonable risk of harm is a matter of risk-utility analysis, with consideration of (1) the utility of the complained-of condition, (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition, (3) the cost of preventing the harm, and (4) the nature of the plaintiff's activities in terms of its social utility or whether it is dangerous by nature. *Broussard v. State*, *supra*; *Dauzat v. Curnest Guillot Logging Inc.*, 2008–0528 (La. 12/2/08), 995 So.2d 1184. The finding of an unreasonable risk of harm is "wed to the facts" and "context-specific," to be determined on the facts and circumstances of the particular case. *Broussard v. State*, *supra*; *Celestine v. Union Oil Co.*, 94–1868 (La. 4/10/95), 652 So.2d 1299.

█ The absence of prior complaints or incidents is a valid consideration in assessing whether a given condition poses an unreasonable risk of harm. *Chambers v. Village of Moreauville*, 2011–898 (La. 1/24/12), 85 So.3d 593; *Waddles v. Brookshire Grocery Co.*, 50,150 (La.App. 2 Cir. 9/30/15), 181 So.3d 772.

█ The mere fact that an accident occurred because of some vice or defect does not elevate the condition of the thing to that of an unreasonably dangerous defect. *Lasyone v. Kansas City Southern R.R.*, 2000–2628 (La. 4/3/01), 786 So.2d 682; *Milton v. E&M Oil Co.*, 45,528 (La. App. 2 Cir. 9/22/10), 47 So.3d 1091. Compliance with building codes is only one factor

to consider in determining a landowner's liability. *Calcagno v. Kuebel, Fuchs P'ship*, 01–691 (La.App. 5 Cir. 11/14/01), 802 So.2d 746; *see also Reid v. State*, 25,778 (La.App. 2 Cir. 5/4/94), 637 So.2d 618, *writ denied*, 94–1415 (La. 9/16/94), 642 So.2d 198 (applying a highway code). Buildings that predate the promulgation of building codes are "grandfathered in," meaning that existing structures not in compliance with new codes are not required to comply with the new codes, unless there is a major renovation. *Luminais v. O.R.S.T.*, *supra*. In the analogous field of zoning, many municipalities allow the continued use of nonconforming structures, to avoid constitutional issues and unfairness to the owner. *Redfearn v. Creppel*, 455 So.2d 1356 (La.1984); *Salem v. City of Alexandria*, 2010–1039 (La.App. 3 Cir. 2/2/11), 56 So.3d 457.

### Discussion

This court granted the writ because the district court's ruling was suffused with statements and findings that patently undermine the grant of new trial. The court never found that the verdict was clearly contrary to the evidence, as required by Art. 1972 (1), only that it "disagreed" with the defendants' position, a finding plainly insufficient for a new trial, *Davis v. Wal–Mart Stores, supra*; *Guillory v. Lee, supra*. The court never found that the 7½" drop-off was unreasonably dangerous, as required by the *jurisprudence constante, Broussard v. State, supra*, only that it posed a risk of harm, an inadequate standard, *Lasyone v. Kansas City Southern R.R., supra*; *Milton v. E&M Oil, supra*. The court also applied a duty to warn, but this duty does not exist absent an unreasonably dangerous condition, *Todd v. Angel*, 48,687 (La.App. 2 Cir. 1/15/14), 132 So.3d 453, *writ denied*, 2014–0613 (La. 5/16/14), 139 So.3d 1027.

On close review, we now find the verdict is indeed supportable by a fair interpretation of the evidence using the risk-utility analysis prescribed by the jurisprudence. Car Town's co-owner, Steve Taylor, and a longtime employee, Charles Wisenor, established that the office was built, as a service station, in the 1960s or early 1970s. Both experts testified that at the time of its construction, this door complied with safety codes, identified by Mr. Vanderbrook as the Southern Building Code and the Life Safety Code. Mr. Howard explained that at the time, a single high step was considered useful to accommodate heavy snowfall or rising floodwater; a rational juror could find some utility in the drop-off, as the building is situated across the street from the Ouachita River.

Both experts also testified that sometime in the 1980s, the codes changed to permit no greater than a half-inch difference at a door, but they agreed that nonconforming, preexisting structures did not have to be modified unless they underwent a "major renovation," described by Mr. Vanderbrook as a project costing 50% of the value of the building. There was no evidence that Car Town had ever undergone such a renovation. Still, Mr. Howard felt the drop-off was a dangerous condition because it was too high and made a stumble "predictable," but Mr. Vanderbrook found it "not dangerous" and in fact no different from steps at the courthouse and other locations around Monroe. Mr. Taylor testified without contradiction that neither his engineer, the Fire Marshal nor any insurance agent ever advised him to modify the step. In short, there was competing expert and lay opinion from which the jury could rationally choose. By contrast, the Supreme Court's opinion in *Broussard, supra*, does not indicate that any expert testified that the 1½-3" between the floor of an elevator and of an office hallway was ever within code, within engineering toler-

ance, or constituted a reasonable obstacle for a person traversing the interior of a building. In short, *Broussard* does not mandate that any differential greater than 3", anywhere, is an unreasonable risk of harm per se.

Mr. Taylor and his employee testified that as long as they could remember, nobody had ever tripped on the front doorstep. While Ms. Nugent may assail their selective memory, the absence of prior complaints or incidents is a valid consideration in assessing whether the doorstep posed an unreasonable risk of harm. *Chambers v. Village of Moreauville, supra*; *Waddles v. Brookshire Grocery Co., supra*.

Taylor admitted that around 2000, he had modified a side entrance to add a ramp for the occasional wheelchair-bound customer; the vast majority of his business used the front door, some 23 feet away. Mr. Vanderbrook suggested that a similar ramp or "landing" at the front door would cure the situation, at a cost of about $200. Also, he admitted that an ADA-compliant ramp would be 7 feet long and would extend into vehicular traffic. In other words, the potentially low cost of correcting the doorstep may have been offset by other engineering challenges.

Finally, the experts testified, and Ms. Nugent concedes in brief, the 7½" drop-off was obvious. It was equally apparent to her and to Car Town.

The finding of an unreasonable risk of harm is fact- and context-specific. *Broussard v. State, supra*; *Celestine v. Union Oil Co., supra*; *Kendall v. Weingarten Realty Mgmt.*, 33,903 (La.App. 2 Cir. 9/27/00), 769 So.2d 171. Although we might agree with the district court that a 7½" drop-off is unusually high and poses *some* risk of harm, we hold that a rational juror viewing the evidence presented could find that this doorstep did not pose an *unrea-*sonable* risk of harm. The district court abused its discretion in jettisoning the verdict.

Finally, we address Ms. Nugent's argument that because Art. 2322 refers to a vice or defect in the building's "original condition," liability may be imposed even if the structure was code-compliant when it was built. She offers no case or scholarly commentary in support, and the argument seems to contradict the testimony of both experts, and cases like *Luminais v. O.R.S.T., supra*, that buildings do not become unreasonably dangerous simply because safety codes are upgraded. In our view, Art. 2322's use of "original condition" is intended to cover conditions that did not result from "ruin" or "neglect of repair." It does not impose liability just because years after construction, a building code becomes more stringent. Compliance with safety codes, at the time of construction or later, is but one factor to consider in assessing the unreasonable risk of harm of a building. *Calcagno v. Kuebel, Fuchs P'ship, supra*; *Reid v. State, supra*.

### Conclusion

For the reasons expressed, we grant the writ and make it peremptory. We vacate the order granting a new trial, and reinstate the jury's verdict. All costs are to be paid by the plaintiff, Audrey Nugent.

**WRIT GRANTED AND MADE PEREMPTORY. ORDER OF NEW TRIAL VACATED. JURY VERDICT REINSTATED.**